**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

FCS ADVISORS, LLC, et al.,      )
            )
      Plaintiffs,      )
            )
v.            )     No. 2:17-cv-04089-NKL
            )
STATE OF MISSOURI, et al.,      )
            )
      Defendants.      )
            )

**ORDER**

Pending before the Court is Defendants Doug Nelson and State of Missouri's Motion to Dismiss, [Doc. 16], Motion to Abstain [Doc. 17], and Motion to Stay Discovery [Doc. 18]. For the following reasons, the Motion to Dismiss is granted. Because the Court grants Defendants' Motion to Dismiss, the Motions to Stay and Abstain are denied as moot.

## I.    Background[1]

Plaintiff FCS Advisors, LLC serves as an administrative advisor and/or agent for lenders, partners, affiliates, and assigns providing assistance to privately held companies in need of financing. Plaintiff Brevet Direct Lending is one such investment fund. Brevet Direct Lending is managed by non-party Brevet Capital Management, LLC, its investment manager, and FCS, its administrative agent. One of Brevet Direct Lending and FCS's objectives is to assist companies—particularly minority-owned companies—that seek to positively impact society. Non-party EngagePoint, Inc. is a Florida Corporation that designs and builds software and

---

[1]    The facts are found in Plaintiff's Complaint. [Doc. 1] For purposes of deciding the Defendants' Motion to Dismiss, the Court accepts the Plaintiffs' factual allegations as true and construes them in the light most favorable to Plaintiffs. *See Stodghill v. Wellston Sch. Dist.,* 512F.3d 472, 476 (8th Cir. 2008).

information technology platforms for health and human services agencies. As relevant to the Plaintiffs' Complaint, key members of EngagePoint's management team are Asian-Indian Americans.

In January 2013, Missouri issued a request for proposals for the "provision and implementation of a comprehensive, fully integrated, state-of-the-art automated human services eligibility, enrollment, and case management system" as part of Missouri's plan to comply with the requirements of the federal Patient Protection and Affordable Care Act (ACA). [Doc. 1, pp. 5–6]. The system was meant to integrate various Missouri programs including Medicaid and the Children's Health Insurance Programs and interface with those programs and the federal agencies administering them. EngagePoint submitted a proposal to serve as the primary contractor for the systems project. Missouri accepted this proposal and awarded EngagePoint the $147 million contract, which included several phases and extended through June 30, 2018.

EngagePoint began work on the project, which was managed by Defendant Doug Nelson, then-Commissioner of the Office of Administration. Nelson informed EngagePoint that to continue with the project, EngagePoint needed to secure additional capital. Thereafter, EngagePoint sought a $20 million initial credit facility from FCS.[2] To evaluate EngagePoint's proposal for credit, Brevet Capital Management, on behalf of Plaintiffs, held a conference call with Nelson on December 5, 2014 as part of its due diligence in determining whether to extend a credit facility. During the conference call, Nelson represented:

> (1) "EngagePoint was performing well on Phase I of the System Project and was likely to continue working on phases II and III so long as its access to liquidity improved";
> (2) that "given EngagePoint's existing involvement with the System Project as the prime contractor, it would not be necessary for Missouri to solicit bids from

---

[2]     A credit facility is a type of loan, specifically "a legally binding agreement to extend funds if requested at a future date, including a general working capital facility such as a revolving credit facility for general corporate or working capital purposes." 12 C.F.R. § 329.3.

other contractors or otherwise issue an RFP for completion of Phases II and III. Instead, that work would flow naturally to EngagePoint";

(3) "he was extremely confident that all three phases of the System Project would be fully funded and would be completed as planned"; and

(4) "as of December 5, 2014, EngagePoint was already performing work on Phase II."

[Doc. 1, pp. 13–14]. Plaintiffs state that "[t]he ultimate thrust of Nelson's statements and representations . . . was that Missouri's present intent was to continue to use EngagePoint as the prime contractor for the System Project and to pay EngagePoint fully for its work." *Id.* at 14. Relying on that information, Plaintiff Brevet Direct Lending issued EngagePoint a credit facility, while Plaintiff FCS served as administrative agent and servicer of the credit facility.

Plaintiffs allege that, at the time of the December 5, 2014 conference call, Nelson knew that "work either would cease, or a significant possibility existed that Nelson would soon order EngagePoint to stop that work," that EngagePoint would or was likely to be replaced on the project by IBM, had not yet been paid in full for its completed work, and would be terminated from the System Project entirely. *Id.* at 15. Nelson did not disclose any of these facts to Plaintiffs.

Soon after the credit facility was issued and EngagePoint had used the proceeds to pay various subcontractors and suppliers that were also working on the state project, Missouri and Nelson "began to systematically undermine EngagePoint and its work on the state project." [Doc. 1, p. 2]. Specifically, against EngagePoint's recommendation, Nelson elected to license a software program called Curam directly from IBM, which caused multiple problems due to gaps in its functionality. Other states using Curam in similar programs reported similar problems.

Although EngagePoint was able to solve Curam's deficiencies, Missouri terminated EngagePoint from the project and has refused to pay EngagePoint approximately $37 million owed for work already completed. As a result, Plaintiffs were required to increase the size of the

credit facility to EngagePoint to more than $60 million, and EngagePoint remains unable to pay any of it back. Plaintiffs also allege that the Defendants' conduct was motivated at least in part by racial animus towards EngagePoint's Asian-Indian American managers, and FCS's association and partnership with them.

Plaintiffs bring this suit alleging in their Complaint, [Doc. 1]:

- Count I: Fraudulent Inducement against Missouri and Nelson in his Official Capacity, by Brevet Direct Lending.
- Count II: Fraudulent Inducement against Nelson in his Individual Capacity, by Brevet Direct Lending.
- Count III: Negligent Misrepresentation against Missouri and Nelson in his Official Capacity, by Brevet Direct Lending.
- Count IV: Negligent Misrepresentation against Nelson in his Individual Capacity, by Brevet Direct Lending.
- Count V: Unjust Enrichment against Missouri and Nelson in his Official Capacity, by Brevet Direct Lending.
- Count VI: Racial discrimination claims under 42 U.S.C. §§ 1981, 1983 against Nelson in his Individual Capacity, by Brevet Direct Lending.
- Count VII: Racial discrimination claims under Title VI of the Civil Rights Act, including 42 U.S.C. § 2000d, against Missouri and Nelson in his Official Capacity, by Brevet Direct Lending.
- Count VIII: Fraudulent Inducement against Missouri and Nelson in his Official and Individual Capacities, by FCS.
- Count IX: Negligent Misrepresentation against Missouri and Nelson in his Official and Individual Capacities, by FCS.
- Count X: Racial Discrimination claims under 42 U.S.C. §§ 1981, 1983 against Nelson in his Individual Capacity, by FCS.
- Count XI: Racial discrimination claims under Title VI of the Civil Rights Act, including 42 U.S.C. § 2000d, against Missouri and Nelson in his Official Capacity, by FCS.

## II.    Discussion

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Federal courts consider motions to dismiss for failure to state a claim and for lack of subject matter jurisdiction under the same standard. *Vankempen v. McDonnell Douglas Corp.*, 923 F. Supp. 146 (E.D. Mo. 1996). "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A complaint must do more than allege labels and conclusions or a formulaic recitation of the elements of a cause of action." *Zink*, 783 F.3d at 1098 (quotations omitted).

**A. Plaintiffs do not have standing to bring Claims VI, VII, X, and XI.**

"[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction. Therefore, a standing argument implicates Rule 12(b)(1)." *Faibisch v. U. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002) (internal citation omitted). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The burden corresponds with the degree of evidence required at the relevant stage of litigation. *Id.* "At the pleading stage . . . general factual allegations of injury . . . may suffice." *Id.*; *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).

The determination of whether a particular plaintiff has standing is a two-part inquiry involving constitutional and prudential standing considerations. First, to demonstrate Article III standing, a plaintiff must show: (1) he has "suffered an injury-in-fact"; (2) the injury is "fairly ... trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Balogh v. Lombardi*, 816 F.3d 536, 541 (8th Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Second, in order to meet the prudential limitations on standing, a plaintiff must ordinarily "assert his own legal interests rather than those of third parties." *Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100 (1979).

Defendants argue that Plaintiffs do not have standing to assert Counts VI, VII, X, and XI of the Complaint, which allege racial discrimination under 42 U.S.C. §§ 1981, 1983, 2000d.

Plaintiffs allege Nelson's conduct rendered EngagePoint unable to pay the interest due or meet the initial maturity obligations of the credit facility and that Nelson's conduct "was motivated at least in part by racial animus towards the Asian-Indian members of EngagePoint's management team." [Doc. 1, p. 34]. Defendants contend Plaintiffs lack standing because: (1) Plaintiffs are not a part of any protected class; (2) there are no allegations of discrimination toward Plaintiffs based on Plaintiffs' race; and (3) Plaintiffs are not intended beneficiaries of federal funds for Medicaid programs that would give them a private right of action under § 1983 or § 2000d. [Doc. 16, p. 21].

### 1. Counts VI and X: 42 U.S.C. §§ 1981, 1983

Counts VI and X assert, through 42 U.S.C. § 1983, claims for violations of the "make and enforce contracts" and "equal benefits" clauses of 42 U.S.C. § 1981. [Doc. 1, p. 34 – 35, 44–45]. Section 1981 states, in relevant part, that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The statute defines "mak[ing] and enforc[ing] contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Plaintiffs' § 1983 claim "can survive only if [it] has alleged that he personally has suffered a direct, nonderivative injury." *Potthoff v. Morin*, 245 F.3d 710, 717 (8th Cir. 2001) (affirming dismissal for lack of Article III standing). A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499 (1975).

Plaintiffs had no rights under the contract between Missouri and EngagePoint. The U.S. Supreme Court has made clear that, without contractual rights, Plaintiffs cannot bring a claim under § 1981:

> We have never retreated from what should be obvious from reading the text of the statute: Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.
>
> Absent the requirement that the plaintiff himself must have rights under the contractual relationship, § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to *somebody's* contract. We have never read the statute in this unbounded—or rather, *peculiarly* bounded—way.

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (emphasis added).

Even assuming for the purpose of this Motion that Nelson's actions were motivated at least in part by racial animus, EngagePoint would have standing to assert that claim, not FCS or Brevet Direct Lending. EngagePoint has asserted its own breach of contract claims in the separate suit currently pending in state court.[3]

Plaintiffs contend a § 1981 claim may be based on a defendant's interference with the plaintiffs' contractual relationship with a third party. [Doc. 43, p. 17]. Plaintiffs cite *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002), which noted "[r]elief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party." The Tenth Circuit affirmed the district court's dismissal in *Harris*, finding the defendant "was not in a position to interfere with plaintiff's ability to enter into new contracts as would support a claim under § 1981." *Id.* Plaintiffs cite *Harris* to support their allegation that "Nelson's animus for EngagePoint's Asian-Indian American members impaired Plaintiffs' contractual relationships with EngagePoint and deprived Plaintiffs of the

---

[3]    Defendants state that there are no allegations of racial animus asserted in the state court suit.

associational, economic, and cultural benefits of working with EngagePoint's Asian-Indian American members." [Doc. 43, pp. 23-24].

Plaintiffs do not allege, however, that Defendants in anyway prevented them from obtaining a contract with EngagePoint, which the *Harris* decision itself would require. *Harris*, 300 F.3d at 1183 (The individual must "show that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment."). Nothing in Plaintiffs' complaint alleges Defendants' racial animus prevented them from securing new contracts. Instead, Plaintiffs claim that Defendants' actions harmed a third party's ability to perform its duties under an existing contractual relationship. This is not sufficient for Plaintiffs to have standing to assert a claim under § 1981.

### 2.      Counts VII and XI: 42 U.S.C. § 2000d

In Counts VII and XI, Plaintiffs assert a claim under Title VI of the Civil Rights Act of 1964, including 42 U.S.C § 2000d. [Doc. 1, pp. 36–37, 46–47]. Title VI prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. Defendants contend that Plaintiffs lack standing to bring this claim because Plaintiffs were not discriminated against on the basis of their race, and therefore do not have third party standing under Title VI. *See Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.").

The U.S. Supreme Court applies a presumption against third-party standing as a prudential limitation on the exercise of federal jurisdiction. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 113 (1976). That presumption may be rebutted in particular circumstances and the rule

against third-party standing is not absolute. *Kowalski v. Tesmer,* 543 U.S. 125, 129 (2004). For a third-party to rebut that presumption, "the party asserting the right [must have] a 'close' relationship with the person who possesses the right," and "there [must be] a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130.

In this case, while Plaintiffs argue they had a close relationship with EngagePoint, there is no hindrance to EngagePoint's ability to protect its own interests. As previously noted, EngagePoint is involved in another suit pending in Missouri state court and is free to assert these claims on its own behalf there. It is for EngagePoint to decide whether to do so.

Plaintiffs cite a number of cases they claim "have found that a plaintiff can sue for an injury based on discrimination against the race of a third party with whom the plaintiff had a relationship." [Doc. 43, p. 28]. These cases are distinguishable. In *Hallmark Developers, Inc. v. Fulton Cty.,* No. 02-cv-01862, 2004 WL 5492706, at *18 (N.D. Ga. Sept. 27, 2004), the plaintiffs' alleged their request to rezone an area of land was denied by defendants based on hostility towards minorities because plaintiffs proposal "would contain affordable housing opportunities for lower-income persons." *Id.* at *3. Thus, the court found "the discriminatory intent of defendant was really directed at an as yet unidentifiable group of people, i.e., blacks who might become tenants of the Subject Property. In such a situation, the status of a white plaintiff as the 'only effective advocate' is even more compelling because the black person is as yet unknown." *Id.* at *19. Here, Plaintiffs are not "the only effective advocate" against alleged racial discrimination.

The court in *Kennedy v. City of Zanesville, OH* "previously found that non-minorities have standing to maintain discrimination actions *for injuries suffered by them* as a result of racially discriminatory practices against a racial minority." 505 F. Supp. 2d 456, 494 (S.D. Ohio 2007) (emphasis in original) (citation omitted). There, sixty-eight individuals and a number of

organizational plaintiffs claimed that the defendants "had a policy, pattern, and practice of denying public water service to the individual Plaintiffs during the last fifty years because they are African–American and/or because they reside in a predominantly African–American neighborhood." *Id.* at 463. The court found prudential standing was met because "each Plaintiff [was] asserting his or her own legal interest rather than those of third parties. . . . The white Plaintiffs are not resting on injuries suffered by their black neighbors; they are instead seeking relief for specific injuries they themselves suffered: lack of public water service as a result of Defendants' alleged discrimination." *Id.* at 494. That is not true in this case. Whereas the *Kennedy* plaintiffs contracted for services with the defendants, Plaintiffs had no such agreement with Missouri or Nelson. While EngagePoint has not been able to make payments on its credit facility, Plaintiffs are third-parties to Defendants' alleged discrimination and are thus not asserting their own legal interests.

Finally, Plaintiffs urge this Court to look to Title VII cases in order to allow them to sue for injuries suffered from discrimination against a third-party's race. [Doc. 43, p. 29]. Plaintiffs cite an Eighth Circuit case from 1989 to argue they have standing to sue when discrimination results in the lost benefits of associating with persons of other racial groups. [Doc. 43, p. 29] (citing *Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 679 (8th Cir. 1989)). However, even if Title VII cases should impact Title VI standing, the U.S. Supreme Court has recently revisited the issue of Title VII standing and Plaintiff's analogy no longer supports its standing. *See Thompson v. North American Stainless, LP*, 562 U.S. 170, 176 (2011).

The Supreme Court acknowledged its earlier dictum in *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972), which broadly interpreted Title VII to "define standing as broadly as permitted by Article III of the Constitution." *Id.* at 209. Using that analysis, a number of courts—including the Eighth Circuit in *Clayton*—found prudential standing was satisfied by "those who were not themselves the objects of discrimination, but were nevertheless injured

'[by] the loss of important benefits from interracial associations.'" *Clayton*, 875 F.2d at 679

(quoting *Trafficante*, 409 U.S. at 209–10).

The *Thompson* Court found the *Trafficante* "dictum was ill-considered" and declined to

follow it:

> If any person injured in the Article III sense by a Title VII violation could sue,
> absurd consequences would follow. For example, a shareholder would be able to
> sue a company for firing a valuable employee for racially discriminatory reasons,
> so long as he could show that the value of his stock decreased as a consequence.

*Thompson*, 562 U.S. 176. Plaintiffs' situation is similar to the Supreme Court's shareholder

hypothetical, where Plaintiffs are attempting to assert EngagePoint's rights because the alleged

violation eventually resulted in a pecuniary loss for Plaintiffs. Therefore, even if this Court was

persuaded by Plaintiffs' Title VII analogy, the cases cited no longer support Plaintiffs' standing.

EngagePoint would undoubtedly have standing to assert racial animus claims in its

pending state court case, but has elected not to do so. Plaintiffs, conversely, are not a member of

a protected class under Title VI and have not rebutted the presumption against third-party

standing. Therefore, Plaintiffs do not have standing to bring a Title VI claim and Counts VII and

XI are dismissed.

**B. Counts I, III, and V, as well as VIII and IX with regard to the State of Missouri
and Nelson in his Official Capacity, are Barred by Eleventh Amendment Sovereign
Immunity.**

The Eleventh Amendment to the U.S. Constitution bars federal court actions against a

state or its agencies seeking monetary relief unless the state waives its immunity, or it is

abrogated by Congress. U.S.C.A. Const. Amend. 11; *Will v. Michigan Dep't of State Police*, 491

U.S. 58, 66 (1989). "[A]n unconsenting State is immune from suits brought in federal courts by

her own citizens as well as by citizens of another state." *Pennhurst State School & Hosp. v.*

*Halderman*, 465 U.S. 89, 100 (1984) (internal quote omitted). The U.S. Supreme Court has adopted a strict standard to evaluate claims that Congress or a respective state has abrogated sovereign immunity. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06 (1990). "The Court will give effect to a State's waiver of Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Id.*

Defendants argue the Eleventh Amendment bar applies to all claims against Missouri and Nelson in his official capacity, Counts I, III, V, and parts of VIII and IX. [Doc. 16, p. 14]. Plaintiffs contend Defendants waived Eleventh Amendment immunity "constructively or impliedly, through their conduct." [Doc. 43, p. 9]. Plaintiffs also contend immunity should not apply to Count V, the unjust enrichment claim.

Plaintiffs allege Missouri waived sovereign immunity by "participat[ing] in a federally funded program that provided federal financial assistance for up to 90% of the cost of the System Project." [Doc. 43, p. 17]. Due to that funding, the System Project is subject to the federal standards and review requirements administered by Centers for Medicare & Medicaid Services (CMS). *Id.* Under 45 C.F.R. Part 16, Missouri may appeal adverse decisions by CMS to the federal Departmental Appeals Board and final decisions of the Departmental Appeals Board can be appealed to federal court. *Id.* Plaintiffs argue this shows Missouri's consent "to federal jurisdiction over related disputes when it accepted federal funding." *Id.*

While states that accept federal funds are required by statute to waive their Eleventh Amendment immunity to discrimination claims, *Doe v. Nebraska*, 345 F.3d 593, 598 (8th Cir. 2003), there are no statutory or constitutional provision, state or federal, showing a Missouri waiver of suit for the state torts asserted in Counts I, III, V, VIII, and IX of Plaintiffs' Complaint.

Missouri's acceptance of federal funding for participation in the Systems Project at issue here cannot, without more, constitute waiver of sovereign immunity, as case law is clear that a state's participation in Medicaid or other federal funding programs is not "sufficient to waive the protection of the Eleventh Amendment." *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n,* 450 U.S. 147, 150 (1981); *see also In re Innes*, 184 F.3d 1275, 1279 (10th Cir. 1999) ("Several Supreme Court decisions provide that neither receipt of federal funds, participation in a federal program, nor an agreement to recognize and abide by federal laws, regulations, and guidelines is alone sufficient to waive Eleventh Amendment immunity.").

Plaintiffs' primary argument is that Missouri waived sovereign immunity through its affirmative conduct regarding the systems project. [Doc. 43, p. 18]. For support Plaintiffs first cite *Entergy, Arkansas v. Nebraska*, 241 F.3d 979 (8th Cir. 2001). However, in that case the Eighth Circuit had held in a previous ruling that by entering into a five state compact Nebraska waived its immunity from suit in federal court brought to enforce the state's contractual obligations. *Id.* at 987. The language of the compact included the following provision: "[T]he Commission may initiate any proceedings or appear as an intervenor or party in interest before any court of law, or any Federal, state or local agency board or Commission that has jurisdiction over any matter arising under or relating to the terms of the provisions of this compact." *Entergy Ark., Inc. v. Nebraska*, 210 F.3d 887, 897 (8th Cir. 2000). As a result of that explicit contractual language, the Eighth Circuit found Nebraska waived its immunity from suit in federal court.

Plaintiffs cite no such explicit provision here, but rather potential appellate procedures should Missouri receive an adverse CMS decision.[4] Without any explicit provision waiving sovereign immunity, the Eighth Circuit's decision in *Entergy, Arkansas* does not support Plaintiffs' argument.

---

[4]     Defendants note "[t]here are no adverse CMS decisions at issue in this lawsuit." [Doc. 44, p. 5].

Plaintiffs also cite *In re Innes*, 184 F.3d 1275 (10th Cir. 1999) for support that Missouri's "affirmative conduct" waived sovereign immunity. [Doc. 43, p. 16]. In that case, the Tenth Circuit held that a state university waived sovereign immunity by participating in a federal student loan program contract that required the university to take action in federal court if a student borrower filed for bankruptcy. *Id.* at 1283. The court found that when a state is "plainly . . . on notice that by electing to participate in [a] federally funded program it accepts affirmative obligations to pursue or defend claims in federal court on the merits," Eleventh Amendment waiver necessarily follows. *Id.*

The federal student loan contract at issue in *In re Innes* is distinguishable from this case. There, the participation agreement contract between the university and the U.S. Department of Education contained explicit provisions requiring federal bankruptcy court jurisdiction: "While the agreement indicates that KSU must comply generally with the terms and conditions of the agreement and with applicable federal law and regulations, it also *explicitly* provides that KSU 'agrees to perform the functions and activities set forth in 34 CFR [§] 674.'" *Id.* at 1281–82 (emphasis in original). Section 674 "subjects [the university] to the mandatory stay provisions of federal bankruptcy law," requires the university to "file a proof of claim in bankruptcy law," and subjects the university to a number of other obligations under federal bankruptcy law. *Id.* at 1282. The Tenth Circuit thus found that "by including this particular regulation in the contract KSU necessarily consented to perform certain functions in the federal bankruptcy court pursuant to § 674.49. . . . To conclude that KSU intended anything other than a waiver would defy logic, contract law, and the equitable principles of bankruptcy." *Id.*

Conversely, Plaintiffs have not brought to the Court's attention any authorization to enter into an agreement that waives immunity. Instead, Plaintiffs argue that Missouri's option to

appeal adverse decisions to an administrative appeals board followed by another option to appeal an appeals board decision to a federal district court is analogous to the University's obligation to perform certain functions in federal bankruptcy court. [Doc. 43, p. 17]. The factual scenarios are distinguishable and the Court is not persuaded by Plaintiffs' argument. Further, as at least one other court of appeals has stated, the U.S. Supreme Court's decision in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004), "addressed the same situation [as *In re Innes*] with different, and broader, reasoning" and reached a different outcome. *Fairley v. Stalder*, 294 F. App'x 805, 810 n.22 (5th Cir. 2008) (finding a suit was barred by sovereign immunity despite the plaintiffs' constructive waiver theory because any such waiver had to be expressly made by constitutional provision or statute, and no such waiver existed).

Finally, Plaintiffs argue that Missouri's immunity should not apply to Count V because it is a quasi-contract claim. [Doc. 43, p. 19]. For support, Plaintiffs cite to a state court case, *S & P Properties, Inc. v. City of University City*, which stated "Section 537.600 codifies and limits the common law of sovereign immunity to only tort actions," 178 S.W.3d 579, 584 (Mo. Ct. App. 2005), and a federal case that acknowledged the *S & P Properties* decision, *O.S. v. Kansas City Public Schools*. No. 13-0261-CV-W-DGK, 2013 WL 5636664, at *3 (W.D. Mo. Oct. 16, 2013). Section 537.600 is a Missouri statute that codifies governmental tort immunity, waiving it for negligent acts or omissions in two specific instances. First, where injuries result from the operation of a motor vehicle within the course of employment, and second, where injuries are caused by a condition of public property, and where the plaintiff establishes several elements demonstrating the danger of the condition. Mo. Ann. Stat. § 537.600 (West).

Missouri has not asserted either its common law or statutory right to sovereign immunity. It asserts the much broader and constitutionally rooted Eleventh Amendment immunity. Missouri

state court decisions that have interpreted Section 537.600 to imply the state is not immune to suit in state court when it enters into a contract, or quasi-contract, do nothing to undermine the Eleventh Amendment's requirements. A valid waiver must unequivocally demonstrate the intent to subject the State to suits in federal court. *In re Innes*, 184 F.3d at 1278. Section 537.600 carves limited exceptions to immunity with regard to negligence, but nowhere does it waive immunity to suits in federal court. *See Long v. Curators of Univ. of Missouri*, No. 920-0814-CV-W-6, 1993 WL 52821, at *3 (W.D. Mo. 1993) ("Sections 537.600.1 and 2 amount to only a general limited waiver of sovereign immunity. The statute carves two limited exceptions to immunity in instances of negligence. However, nowhere does the statute indicate an intent to waive immunity to suits in federal court in particular.")

*O.S. v. Kansas City Public Schools* is distinguishable. That case did not deal with a question of contract versus tort immunity. Rather, the district court acknowledged that the case in front of it was a tort, and therefore subject to the statute. It then examined whether the facts of the case fell within the explicit exceptions to tort immunity codified by the statute. Additionally, though the Eighth Circuit has not addressed Eleventh Amendment immunity and Section 537.600 with regard to contract cases, it has held the statute does not waive immunity in §1983 cases. *Williams v. State of Mo.*, 973 F.2d 599, 600 (8th Cir. 1992). This runs directly contrary to Plaintiffs proposal that the statute only provides Eleventh Amendment immunity in tort actions.

The "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *In re Innes*, 184 F.3d at 1278 (citation omitted). Waiving immunity "require[s] an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Id.* Missouri has not made such "unequivocal indication" here, and Defendants are entitled to sovereign immunity on

Counts I, III, and V, as well as VIII and IX with regard to the state of Missouri and Nelson in his official capacity.

### C. Counts IV and IX are barred by Official Immunity.

Defendants argue Count IV and Count IX, which allege negligent misrepresentation against Nelson in his individual capacity, fail because he enjoys official immunity for negligence.

Under Missouri law, official immunity "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *K.B. v. Waddle*, 764 F.3d 821, 824 (8th Cir. 2014) (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008)). A discretionary act "requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued." *Id.* at 824–25. Public employees do not have official immunity "for torts committed when they are acting in a ministerial capacity." *Southers*, 263 S.W.3d at 610 (Mo. 2008). A ministerial function "is one of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Waddle*, 764 F.3d at 825 (internal quotes omitted).

Defendants initially argued Count IV and Count IX were barred because Nelson was acting within the course of his official duties as the Commissioner of the Administration, speaking based on his knowledge and position as a commissioner, and not intentionally misleading others (because "negligence by definition is a non-intentional tort"). [Doc. 16, p. 15].

In its Suggestions in Opposition, Plaintiffs do not clearly contest the discretionary ministerial distinction, but instead argue Nelson is not entitled to official immunity on Count IV

and IX because "Nelson's representations were made in bad faith and with malice . . . Nelson either made intentionally false and misleading representations to Plaintiffs or he purposely concealed and failed to disclose his ignorance of the facts upon which the representations were based." [Doc. 43, pp. 22-23]. Plaintiffs also pleaded that Nelson's objective was "to advance his own career and standing among various state and private actors, including IBM, at the expense Plaintiffs and Missouri." *Id.* at 22.

In their Reply Suggestions, Defendants argue that because Plaintiff's allegations are based on bad faith and malice, Counts IV and IX are not actually claims for negligence but for intentional wrongdoing, which is duplicative of the fraud claims and should be dismissed. [Doc. 44, p. 7].

Under Missouri law, "[e]ven a discretionary act . . . will not be protected by official immunity if the conduct is willfully wrong or done with malice or corruption." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008), as modified on denial of reh'g (Sept. 30, 2008); *see also McCormack v. Douglas*, 328 S.W.3d 446, 449 (Mo. Ct. App. 2010). Plaintiffs point to several cases that have allowed negligence claims to survive a motion to dismiss based on official immunity by alleging malice. *See Carson v. Wayer*, No. 4:15-CV-507 RLW, 2015 WL 3440263, at *2 (E.D. Mo. May 27, 2015); *Works v. Newton Cty., Mo.*, No. 11-03034-CV-S-ODS, 2011 WL 1405081, at *1 (W.D. Mo. Apr. 13, 2011). However, each case Plaintiffs' cite is distinguishable in an important way—the absence of separate fraud or intentional tort claims in addition to negligence.

In *Carson v. Wayer*, the plaintiff brought a wrongful death action against several state employees at the St. Charles Rehabilitation Center. No. 4:15-CV-507 RLW, 2015 WL 3440263, at *1 (E.D. Mo. May 27, 2015). There, the plaintiff's son had died while in the Missouri State

Department of Mental Health's custody, and thus she brought three separate claims for negligent hiring, retention, and supervision, as well as a claim under §§ 1983 and 1988 for due process violations. *Id.* Similarly, in *Works v. Newton Cty., Mo*, the plaintiff brought a wrongful death action, asserting federal constitutional claims as well as negligence and loss of consortium claims. No. 11-03034-CV-S-ODS, 2011 WL 1405081, at *1 (W.D. Mo. Apr. 13, 2011). Neither case included any fraud nor intentional tort claims apart from negligence.

For Plaintiffs to argue bad faith and malice in their negligent misrepresentation claims means those counts become something more than ordinary negligence. However, in the present case, that something more is already alleged in separate counts, the fraudulent inducement claims. Because Plaintiffs brought claims for both negligent misrepresentation and fraudulent inducement, either the negligence was ordinary and therefore immune, *see Southers,* 263 S.W.3d at 610 ("A finding that a public employee is entitled to official immunity does not preclude a finding that he or she committed a negligent act-because official immunity does not deny the existence of the tort of negligence, but instead provides that an officer will not be liable for damages caused by his negligence."); *see also McCormack v. Douglas*, 328 S.W.3d 446, 451 (Mo. Ct. App. 2010); *Woods v. Ware*, 471 S.W.3d 385, 391 (Mo. Ct. App. 2015); *Haley v. Bennett*, 489 S.W.3d 288, 294 (Mo. Ct. App. 2016), or it was with bad faith and malice, in which case it becomes duplicative of fraud.[5]

As plead, Counts IV and IX alleging negligent misrepresentation are barred by official immunity.

**D. Count II and Count VIII with regard to Nelson in his individual capacity are insufficient under Rule 9(b)**

---

[5]    As discussed below, Plaintiffs have not pleaded fraud with sufficient particularity. Therefore, any claim for negligent misrepresentation also fails if it is also based on an allegation of fraud.

In Counts II and VIII of the complaint, Plaintiffs allege that Nelson fraudulently induced Brevet Direct Lending to invest in EngagePoint, and FCS to contractually bind itself to act as administrative agent. [Doc. 1, pp. 23, 38]. Defendants move to dismiss Counts II and VIII under Fed. R. Civ. P. 12(b)(6) because Nelson's statements were merely opinions and predictions, rather than "false statements of present-existing facts," and because Plaintiffs could not, as a matter of law, rely on representations contrary to the bargained for contract between EngagePoint and Missouri. [Doc. 16, p. 15]. Defendants also contend that the complaint lacks the specificity required under Rule 9(b). *Id.*

Under Missouri law, a claim for fraud requires the following elements:

(1) a representation, (2) its falsity at the time made, (3) its materiality, (4) the speaker's knowledge of the falsity, (5) the speaker's intent that the statements should be acted upon by the other party in the manner contemplated, (6) the other party's ignorance of the falsity, (7) the other party's reliance on the perceived truthfulness of the representation, (8) the right to rely upon the statement, and (9) damages.

*Ryann Spencer Group, Inc. v. Assurance Co. of America*, 275 S.W.3d 284, 287 (Mo. Ct. App. 2008). Defendants' argument is focused on the eighth element, "the right to rely upon the statement." Plaintiffs allege that during the conference call, Nelson represented that:

(1) "EngagePoint was performing well on Phase I of the System Project and was likely to continue working on phases II and III so long as its access to liquidity improved";
(2) "it would not be necessary for Missouri to solicit bids from other contractors or otherwise issue an RFP for completion of Phases II and III. Instead, that work would flow naturally to EngagePoint";
(3) "he was extremely confident that all three phases of the System Project would be fully funded and would be completed as planned";

[Doc. 1, pp. 13–14]. Plaintiffs state that "[t]he ultimate thrust of Nelson's statements and representations . . . was that Missouri's present intent was to continue to use EngagePoint as the prime contractor for the System Project and to pay EngagePoint fully for its work." *Id.* at 14.

Defendants argue that Plaintiffs had no right to rely on these statements because they are merely statements of opinion and predictions for the future, rather than misrepresentations of present facts. "'Mere statements of opinion, expectations and predictions for the future' cannot support a fraud claim." *Arthur v. Medtronic, Inc.*, 123 F. Supp. 3d 1145, 1150 (E.D. Mo. 2015) (quoting *Stevens v. Markirk Constr., Inc.*, 454 S.W.3d 875, 881 (Mo. 2015)). This is particularly true when the statements concern "future actions of an independent third party," because "[a plaintiff] is not justified in relying on such representations as a matter of law." *Ryann Spencer Group*, 275 S.W.3d at 290. *See also Eureka Pipe, Inc. v. Cretcher-Lynch & Co.,* 754 S.W.2d 897, 898-99 (Mo. Ct. App. 1988); *Shaughnessy, Kniep, Hawe Paper Co. v. Fettergroup*, No. 4:14–CV–00233–JAR2015, WL 1456993, at *5 (E.D. Mo. Mar. 30, 2015). However, "[s]tatements of present intent may be representations of fact which, if false, will support fraud claims under Missouri law." *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1218 (8th Cir. 1985).

Statements such as "performing well," "extremely confident," and "likely to continue," standing alone are merely expressions of opinion, insufficient to support a claim of fraud. *See Constance v. B.B.C. Dev. Co.*, 25 S.W.3d 571, 587 (Mo. Ct. App. 2000) ("The generally recognized distinction between statements of fact and opinion is that whatever is susceptible of exact knowledge is a matter of fact, while that not susceptible is generally regarded as an expression of opinion."); *see also, e.g.*, *First Presbyterian Church of Mankato, Minn. v. John G. Kinnard & Co.*, 881 F. Supp. 441, 444 (D. Minn. 1995) ("It is certainly true that statements such as "performing well" or "low risk" are plainly expressions of opinion . . . ."). Even in context, Plaintiffs could not have relied on the statements as a matter of law. Brevet Direct Lending and FCS are sophisticated parties. Plaintiffs' own allegations demonstrate that the teleconference between Defendant Nelson and Plaintiffs' representative was only one part—albeit a large one—

of their due diligence in making a sizable loan. [Doc. 1, p. 12]. Additionally, the contract provided Missouri the right to terminate at any time for its own convenience, without penalty or recourse, by giving written notice to EngagePoint at least thirty days in advance. [Doc. 1-2, p. 61]. It also stated it could not be modified orally, by any party or non-party. [Doc. 1-2, p. 58]. Therefore, the contract precluded any reasonable reliance on Nelson's allegedly contradicting statements. *See Martin v. American Family Mut. Ins. Co.*, 157 F.3d 580, 582 (8th Cir. 1998) ("[N]o reasonable jury could find the agents' reliance on the statements was reasonable given the agency contract language, which says the agencies 'may be terminated by either party with or without cause,' the contract may not be modified except by written agreement, and the written contract takes precedence over any inconsistent oral statements.").

Because Plaintiffs have failed to plead sufficient facts to state a claim for fraudulent inducement, Counts II and VIII must be dismissed.

### E. Motions to Stay, Abstain

Because the Court grants Defendants' Motion to Dismiss, the Motions to Stay and Abstain are denied as moot.

## III.    Conclusion

For the foregoing reasons, Counts I, III, and V, as well as VIII and IX, with regard to the State of Missouri and Nelson in his Official Capacity, of Plaintiffs' Complaint are barred by the Eleventh Amendment, Counts II and VIII against Defendant Nelson in his individual capacity fail to sufficiently plead a claim of fraud, Count IV and Count IX against Defendant Nelson in his individual capacity are barred by Defendant Nelson's official immunity, and Plaintiffs lack standing to assert Counts VI, VII, X, and XI. Defendants' Motion to Dismiss, [Doc. 16], is granted. The Motions to Abstain, [Doc. 17], and Stay, [Doc. 18], are denied as moot.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  _October 16, 2017_
Jefferson City, Missouri